# In the United States Court of Federal Claims
## OFFICE OF SPECIAL MASTERS
## No. 15-687V
Filed: July 25, 2018

| | | |
|---|---|---|
| * * * * * * * * * * * * * * | | |
| WHITNEY HILL, *on behalf of CT,* | * | UNPUBLISHED |
| *deceased minor* | * | |
| | * | |
| Petitioner, | * | Decision on Attorneys' Fees and Costs; |
| v. | * | Reasonable Basis; Hourly Rate |
| | * | |
| SECRETARY OF HEALTH | * | |
| AND HUMAN SERVICES, | * | |
| | * | |
| Respondent. | * | |
| * * * * * * * * * * * * * * | | |

*Patricia Finn, Esq.*, Patricia Finn, P.C., Nanuet, NY for petitioner.
*Colleen Hartley, Esq.*, U.S. Department of Justice, Washington, DC, for respondent.

### DECISION ON ATTORNEYS' FEES AND COSTS[1]

**Roth**, Special Master:

      On July 1, 2015, Whitney Hill ("Ms. Hill," or "petitioner") filed a petition for compensation under the National Vaccine Injury Compensation Program[2] on behalf of her minor child, C.T. Petitioner alleges that C.T. received inactivated poliovirus ("IPV"), hepatitis B, diphtheria-tetanus-acellular pertussis ("DTaP"), haemophilus influenzae B ("Hib"), pneumococcal-13, and rotavirus vaccinations on or about June 19, 2013, which resulted in his injuries and subsequent death. *See* Petition ("Pet."), ECF No. 1. On October 24, 2017, the

---

[1] Although this Decision has been formally designated "unpublished," it will nevertheless be posted on the Court of Federal Claims's website, in accordance with the E-Government Act of 2002, Pub. L. No. 107-347, 116 Stat. 2899, 2913 (codified as amended at 44 U.S.C. § 3501 note (2006)). **This means the Decision will be available to anyone with access to the internet.** However, the parties may object to the Decision's inclusion of certain kinds of confidential information. Specifically, under Vaccine Rule 18(b), each party has fourteen days within which to request redaction "of any information furnished by that party: (1) that is a trade secret or commercial or financial in substance and is privileged or confidential; or (2) that includes medical files or similar files, the disclosure of which would constitute a clearly unwarranted invasion of privacy." Vaccine Rule 18(b). Otherwise, the whole Decision will be available to the public. *Id.*

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all "§" references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2012).

undersigned dismissed this case for insufficient proof, pursuant to Vaccine Rule 11(a). Decision, ECF No. 44.

## I. Facts

C.T. was born on April 19, 2013 via normal spontaneous vaginal delivery. Pet. Ex. 5 at 6. He did not spontaneously cry at birth. *Id*. His Apgar scores were 1 at 1 minute, 8 at 5 minutes, and 9 at 10 minutes. He had category 2 fetal heart tones throughout labor and delivery. The placenta tested positive for group B streptococcus. *Id*.

On April 26, 2013, C.T. was presented to his pediatrician for a well-baby visit. Pet. Ex. 1 at 1. His exam was normal. *Id*.

On May 26, 2013, C.T. was presented to Children's Mercy Hospital for "abnormal respirations." Pet. Ex. 2 at 3-4. Petitioner reported that C.T. had been having "gasping" episodes during the past two weeks which only happened when he was laying down in his bassinet. *Id*. at 4. C.T. was also noted to have eye discharge and white patches on his tongue. *Id*. at 3. He was diagnosed with reflux, eye drainage, and oral thrush, and prescribed eye drops, Nystatin, and Zantac. *Id*. at 4-5. Petitioner was advised to follow-up with C.T.'s pediatrician. *Id*. at 8.

On June 7, 2013, C.T. was presented to his pediatrician for follow-up of his apnea spells. Pet. Ex. 1 at 4. His exam was normal. *Id*. He was diagnosed with esophageal reflux and apnea, referred to the sleep clinic, and prescribed Pepcid. *Id*.

On June 19, 2013, C.T. was presented to his pediatrician for a well-baby visit. Pet. Ex. 1 at 6. His exam was normal; he still had apnea and was still taking Pepcid for reflux. *Id*. C.T. received IPV, hepatitis B, DTaP, Hib, pneumococcal conjugate, and rotavirus vaccines. *Id*. at 6-7.

On July 5, 2013, police officers were dispatched to petitioner's home at 5:10 am due to "a possible non-breathing child." Pet. Ex. 6 at 1. According to the police report, petitioner "said she woke up at approximately 0500 hours and found [C.T.] lying face down on the bed not breathing." *Id*. at 2. Petitioner reported that "she took the child outside to wait for the ambulance." *Id*. C.T.'s father called 911.

According to the fire department EMS report, the call was received at 5:08 am. Pet. Ex. 7 at 6. The fire department arrived at 5:15 am. *Id*. According to the fire department report, petitioner reported that she put C.T. in bed about two hours before; she woke up around 5:00 am and "found [C.T.] face down in bed" with his mother and sister. *Id*. at 8. Petitioner reported that C.T. had been having problems with "gasping," for which he had been seen by the pediatrician. When the fire department arrived at petitioner's home, C.T. was laying on the deck with petitioner "squatting next to him." *Id*. CPR was not initiated prior to the arrival of the fire department. *Id*. EMS found C.T. unresponsive and without a pulse. Pet. Ex. 3 at 4. They started CPR immediately and intubated him. *Id*.

C.T. was transported to the emergency room at Children's Mercy Hospital via ambulance. Pet. Ex. 3 at 4. Resuscitation efforts continued in the emergency room. *Id.* at 5. He was pronounced dead at 5:58 am due to cardiopulmonary arrest of unknown etiology. *Id.*

According to the autopsy report, C.T. "was found unresponsive lying next to [petitioner] in bed on 7/05/2013 at 0500. [C.T.] was last known alive the evening prior when [petitioner] laid her (sic) down in bed next to her on 7/4/2013 at 2330." Pet. Ex. 8 at 5. Upon autopsy, C.T. was noted to have petechiae on his lungs and thymus. *Id.* at 10. The liver, kidneys, lungs, brain, adrenal glands, and epiglottis were found to have "severe congestion." *Id.* at 46. The cause of death was given as "Probably asphyxia," based on C.T.'s history of being found unresponsive after co-sleeping with an adult, combined with autopsy findings of thymus and lung petechiae and severe congestion of the internal organs. *Id.* at 42.

## II. Procedural History

The petition was filed on July 1, 2015. ECF No. 1. Petitioner filed medical records (Pet. Ex. 1-4) on July 28, 2015. ECF No. 9. Respondent filed a status report on September 8, 2015, requesting that petitioner file additional records, including prenatal, birth and newborn nursery records; EMS records for July 5, 2013; any police records existing for July 5, 2013; and any notes from the coroner's investigation. Resp. S.R. at 1, ECF No. 11. On November 13, 2015, petitioner filed C.T.'s birth records, the police report, and EMS records. Pet. Ex. 5-7, ECF No. 13. Both the police report and the EMS records noted that C.T. was found lying face down in bed. Pet. Ex. 6 at 2, Pet. Ex. 7 at 8. On December 10, 2015, petitioner filed C.T.'s complete autopsy report. Pet. Ex. 8, ECF No. 15. The autopsy stated that C.T. was "found unresponsive lying next to his mother in bed." *Id.* at 42. Petitioner filed C.T.'s autopsy photos on CD as Pet. Ex. 9. ECF No. 16.

This case was reassigned to me on January 14, 2016. ECF No. 19.

On January 27, 2016, respondent filed his Rule 4(c) Report, stating that petitioner's claim was not appropriate for compensation. Rule 4 at 1, ECF No. 20. Respondent submitted that petitioner had not provided an expert report to support her claim. *Id.* at 5. Respondent did not object to reasonable basis.

The Rule 5 status conference was held on February 18, 2016. Scheduling Order at 1, ECF No. 23. Petitioner was advised that her expert report needed to address several concerns, including the 16-day gap between C.T.'s vaccinations and his death; petitioner's statement that C.T. was face down in bed at the time of death; the autopsy results, which showed severe congestion of internal organs; and the coroner's finding of cause of death as asphyxia due to co-sleeping. *Id.* The parties agreed that petitioner should file an expert report in support her claim. *Id.*

Petitioner requested and was granted three extensions of time to file her expert report. ECF Nos. 24-27. On September 22, 2016, petitioner filed an expert report from Dr. Laurel Waters, a pathologist, and supporting medical literature. Pet. Ex. 10-19, ECF No. 28. Dr. Waters opined that the findings on C.T.'s autopsy of petechiae on the lungs and thymus were not specific for asphyxia, but rather "could also be seen in a vaccine-related death caused by a cytokine storm." Pet. Ex. 11

at 6. In Dr. Waters' opinion, C.T. had an amnestic response to the vaccinations he received on June 19, 2013, which induced a cytokine storm that resulted in C.T.'s death sixteen days later. *Id*. at 9.

On December 27, 2016, respondent filed a status report advising that he intended to file reports from two experts, Dr. Brent Harris, a neuropathologist, and Dr. Christine McCusker, a pediatric immunologist. Resp. S.R., ECF No. 30. On February 28, 2017, respondent filed Dr. Harris's report. Resp. Ex. A-B, ECF No. 32. Dr. Harris agreed with the autopsy findings of "probable accidental asphyxia from a non-recommended sleeping situation." Resp. Ex. A at 2, 5.

On March 10, 2017, respondent filed Dr. McCusker's report. Resp. Ex. C-D, ECF No. 33. Dr. McCusker disagreed with Dr. Waters' theory, opining that the significant systemic cytokine release necessary for a cytokine storm would manifest as a variety of severe symptoms, including high fever, headache, nausea, vomiting, diarrhea, and/or rash. Resp. Ex. C at 6. Dr. McCusker pointed out that C.T. did not display any of these symptoms during the sixteen days between his vaccinations and his death. *Id*. In Dr. McCusker's opinion, C.T.'s death was most likely a result of Sudden Infant Death Syndrome, or "SIDS." She explained that environmental conditions or stressors can lead to changes in an infant's oxygen balance; in normal infants, protective mechanisms in the brain activate and correct this problem. However, if this mechanism fails to correct, the child can suffer from cardiorespiratory arrest. *Id*. at 7. Dr. McCusker noted that C.T. had "several identifiable risk factors for SIDS," including co-sleeping, reflux, and exposure to tobacco smoke. *Id*. at 8.

A status conference was held on May 2, 2017. Scheduling Order, ECF No. 34. Petitioner advised that she intended to obtain an expert report from Dr. Douglas Miller, a neuropathologist. Petitioner further advised that she intended to file a supplemental expert report from Dr. Waters. The undersigned then discussed several issues that arose in reviewing both parties' expert reports. In her first report, Dr. Waters stated that petitioner "found CT unresponsive on his back in her bed where she had put him down to sleep." Pet. Ex. 11 at 5. This assertion was not supported by the medical records. Additionally, Dr. McCusker noted that Dr. Waters discussed the pneumovax-23 vaccine, whereas C.T. received the pneumococcal-13 vaccine. Scheduling Order at 2. Furthermore, Dr. McCusker noted that C.T. did not experience any symptoms of cytokine activation such as high fever, respiratory distress, irritability, or rash. Finally, Dr. McCusker noted that Dr. Waters did not provide any medical literature to support her assertions that vaccinations induced an amnestic response and a cytokine storm in C.T. Petitioner was ordered to have Dr. Waters address the foregoing issues in her supplemental report. *Id*. at 2-3. Additionally, the undersigned noted that the full police investigation report had not been filed in this matter; petitioner was ordered to file a complete copy of the report. *Id*. at 1.

A status conference was held on August 2, 2017, at petitioner's request. *See* Motion for Status Conference, ECF No. 37. During the conference, petitioner advised that Dr. Miller needed to travel to the Jackson County Medical Examiner's Office to inspect the contents of the "stock bottles" to determine whether additional tissue samples could provide needed information. Scheduling Order at 1, ECF No. 39. Respondent advised that he would like to have Dr. Harris accompany Dr. Miller to the medical examiner's office. *Id*. Counsel for both parties agreed to coordinate the visit and file a joint status report advising the Court of the date on which the experts would review the stock bottles. *Id*. Additionally, petitioner advised that she had recently received

a copy of C.T.'s birth certificate, which was necessary in order to obtain the full police investigation report; she was given an additional 45 days to file the police report. *Id*.

On August 22, 2017, petitioner filed the full police investigation report of C.T.'s death. Pet. Ex. 20, ECF No. 40. Petitioner also filed a status report advising that the medical examiner's office had disposed of the tissue samples contained in the "stock bottle." Pet. S.R. at 2-3, ECF No. 41. Therefore, Dr. Miller was unable to complete his review and unable to provide an expert report. *Id*. at 3.

Petitioner was ordered to file a status report by September 22, 2017, advising the Court as to how she intended to proceed. Non-PDF order, issued Aug. 22, 2017. Petitioner filed her status report on September 19, 2017, stating, "Petitioner would like [to] proceed by filing a Motion for a Decision Dismissing the Case." Pet. S.R. at 1, ECF No. 43. On October 19, 2017, petitioner filed a Motion for a Decision Dismissing the Petition. ECF No. 43. The undersigned issued a dismissal decision on October 24, 2017. ECF No. 44.

On May 25, 2018, petitioner filed a Motion for Attorneys' Fees and Costs. Motion for Fees, ECF No. 49. Petitioner requests attorneys' fees in the amount of $13,355.30 and costs in the amount of $11,350.92, for a total amount of $24,706.22. *Id*. at 1; *see also* Motion for Fees, Ex. A at 9. In accordance with General Order #9, petitioner's counsel represents that petitioner did not incur any out-of-pocket expenses. *Id*. at 3.

On June 7, 2018, respondent filed a response to petitioners' Motion for Fees. Response, ECF No. 50. Respondent deferred "to the Special Master to determine whether the statutory requirements for an award of attorneys' fees and costs (including the reasonable basis requirement) are met in this case," and "respectfully recommend[ed] that the Special Master exercise her discretion and determine a reasonable award for attorneys' fees and costs." *Id*. at 2-3.

Petitioner did not file a reply. This matter is now ripe for decision.

## III. Applicable Law and Analysis

### A.    Good Faith and Reasonable Basis

The Vaccine Act permits an award of "reasonable attorneys' fees" and "other costs." § 15(e)(1). If a petitioner succeeds on the merits of his or her claim, the award of attorneys' fees is automatic. *Id*.; *see Sebelius v. Cloer*, 133 S. Ct. 1886, 1891 (2013). However, a petitioner need not prevail on entitlement to receive a fee award as long as the petition was brought in "good faith" and there was a "reasonable basis" for the claim to proceed. § 15(e)(1).

Reasonable basis is typically viewed as "an objective standard determined by the 'totality of the circumstances.'" *Chuisano v. United States*, 116 Fed. Cl. 276, 286 (2014) (citations omitted). It does not look to the "likeliness of success but more to the feasibility of the claims." *Id*. at 285. "This totality of the circumstances assessment should take into account evidence available at the time a claim is filed and evidence that becomes available as the case progresses." *Cottingham v. Sec'y of Health & Human Servs*., 2017 WL 4546579, at *7 (Fed. Cl. 2017). Accordingly, a case

may have a reasonable basis when filed, but may lose reasonable basis during the pendency of the case. Petitioner's counsel has "an obligation to voluntarily dismiss a Vaccine Act claim once counsel knows or should know a claim cannot be proven." *Cottingham* at *7-8.

"Special masters have historically been quite generous in finding reasonable basis for petitions." *Turpin v. Sec'y of Health & Human Servs.*, 2005 WL 1026714 at *2 (Fed. Cl. Spec. Mstr. Feb. 10, 2005). Typically, reasonable basis is not found when "fundamental inquires [sic] are not made." *Di Roma v. Sec'y of Health & Human Servs.*, No. 90-3277, 1993 WL 496981, at *2 (Fed. Cl. Spec. Mstr. Nov. 18, 1993). To ensure reasonable basis, an attorney should make a pre-filing inquiry into the claim, and it must be supported by medical records or medical opinion. *Mack v. Sec'y of Health & Human Servs.*, No. 15-149V, 2017 WL 5108680, at *3 (Fed. Cl. Spec. Mstr. Sep. 28, 2017) (internal citations omitted). While leniency has been shown when the statute of limitations was about to expire, counsel may not use an impending statute of limitations deadline to establish reasonable basis for a claim. *Simmons v. Sec'y of Health & Human Servs.*, 2017 WL 5146179 at *3 (Fed. Cir. 2017).

Petitioner submits that her petition maintained a reasonable basis "up until learning the medical examiner had destroyed the tissue samples, making additional testing required to prove causation impossible." Motion at 7. Petitioner submits that the fees incurred after this point were "minor and reasonably incurred in 'winding down' the case." *Id.*

Respondent did not comment on whether petitioner's claim met the reasonable basis standard, but rather deferred to the special master's discretion. Response at 2.

Petitioner filed an expert report from Dr. Waters, a pathologist, and had obtained a second expert, Dr. Miller, to provide additional support to her claim. Dr. Miller apparently believed that petitioner had a viable claim to the extent that he was willing to travel to the Jackson County Medical Examiner's Office in Missouri in order to obtain additional tissue samples needed for his report. Unfortunately, those tissue samples were not available, and Dr. Miller was unable to author a report. Once it became apparent that petitioner would not be able to sustain her burden under *Althen*, petitioner filed a voluntary motion to dismiss.

At no time during this proceeding did respondent raise the issue of reasonable basis, despite having ample opportunities. Respondent's Rule 4(c) Report noted that C.T. was found lying face down and submitted that this "case appears to be a straightforward one of asphyxiation unrelated to any vaccine," but did not raise the issue of reasonable basis. Rule 4 at 5. Similarly, respondent did not raise any objections during the Rule 5 status conference when the petitioner advised of her intent to obtain an expert.  To the contrary, respondent countered in this case with two expert reports, one from Dr. McCusker and one from Dr. Harris. Further, respondent was very cooperative, coordinating with petitioner's counsel for Dr. Miller and Dr. Harris to visit the Jackson County Medical Examiner's Office in an effort to obtain additional tissue samples for further investigative review.

Based on the totality of the circumstances, it is my opinion that petitioner had a reasonable basis for this claim until Dr. Miller advised that there was insufficient information for him to rely

on in issuing a report. At that time, petitioner promptly dismissed the case. It is notable that Dr. McCusker's report concluded that C.T. died of SIDS rather than asphyxia.

**B.      Evaluation of Requested Attorneys' Fees and Costs**

The Federal Circuit has endorsed the use of the lodestar approach to determine what constitutes "reasonable attorneys' fees" and "other costs" under the Vaccine Act. *Avera v. Sec'y of Health & Human Servs.*, 515 F.3d 1343, 1349 (Fed. Cir. 2008). Under this approach, "an initial estimate of a reasonable attorneys' fees" is calculated by "multiplying the number of hours reasonably expended on the litigation times a reasonable hourly rate." *Id.* at 1347-48 (quoting *Blum v. Stenson*, 465 U.S. 886, 888 (1984)). That product is then adjusted upward or downward based on other specific findings. *Id.*

Special masters have substantial discretion in awarding fees and may adjust a fee request *sua sponte*, apart from objections raised by respondent and without providing petitioners with notice and opportunity to respond. *Sabella v. Sec'y of Health & Human Servs.*, 86 Fed. Cl. 201, 209 (2009). Special masters need not engage in a line-by-line analysis of petitioner's fee application when reducing fees. *Broekelschen v. Sec'y of Health & Human Servs.*, 102 Fed. Cl. 719, 729 (2011).

**1.      Reasonable Hourly Rate**

A "reasonable hourly rate" is defined as the rate "prevailing in the community for similar services by lawyers of reasonably comparable skill, experience and reputation." *Avera*, 515 F.3d at 1348 (quoting *Blum*, 465 U.S. at 896 n.11). In general, this rate is based on "the forum rate for the District of Columbia" rather than "the rate in the geographic area of the practice of petitioner's attorney." *Rodriguez v. Sec'y of Health & Human Servs.*, 632 F.3d 1381, 1384 (Fed. Cir. 2011) (citing *Avera*, 515 F. 3d at 1349). There is a "limited exception" that provides for attorney's fees to be awarded at local hourly rates when "the bulk of the attorney's work is done outside the forum jurisdiction" and "there is a very significant difference" between the local hourly rate and forum hourly rate. *Id.* This is known as the *Davis County* exception. *See Hall v. Sec'y of Health & Human Servs.*, 640 F.3d 1351, 1353 (2011) (citing *Davis Cty. Solid Waste Mgmt. & Energy Recovery Special Serv. Dist. v. U.S. EPA*, 169 F.3d 755, 758 (D.C. Cir. 1999)).

In this case, petitioner's counsel practices in Nanuet, NY, which is considered to be part of the New York City metro area. *Becker v. Sec'y of Health & Human Servs.*, No. 13-687V, 2014 WL 4923160 at *5-6 (Fed. Cl. Spec. Mstr. Sept. 11, 2014). Therefore, forum rates apply in this case.

For cases in which forum rates apply, *McCulloch* provides the framework for determining the appropriate hourly rate range for attorneys' fees based upon the attorneys' experience. *McCulloch v. Sec'y of Health & Human Servs.*, No. 09-293V, 2015 WL 5634323 (Fed. Cl. Spec. Mstr. Sept. 1, 2015). The Office of Special Masters has accepted the decision in *McCulloch* and has issued a Fee Schedule for subsequent years.[3]

---

[3] The fee schedules are posted on the Court's website.  *See* Office of Special Masters, *Attorneys' Forum Hourly Rate Fee Schedule: 2015-2016*, http://www.uscfc.uscourts.gov/sites/default/files/Attorneys -

Petitioner has requested hourly rates for Ms. Finn of $316.00 for work performed in 2015, $328.00 for work performed in 2016, $340.00 for work performed in 2017, and $352.00 for work performed in 2018. Ms. Finn has previously been awarded the requested rates for work performed in 2015 and 2016. *Murphy v. Sec'y of Health & Human Servs.*, No. 05-1063V, 2017 WL 5386606 at *2 (Fed. Cl. Spec. Mstr. Aug. 25, 2017); *Echevarria v. Sec'y of Health & Human Servs.*, No. 15-100V, 2016 WL 6872975 at* 3 (Fed. Cl. Spec. Mstr. Oct. 28, 2016).

Ms. Finn has been practicing for approximately 14 years. For attorneys with 11 to 19 years of experience, an appropriate hourly rate for work performed in 2017 ranges from $307.00 to $383.00. For work performed in 2018, an appropriate hourly rate ranges from $317.00 to $396.00. The hourly rates requested for work performed by Ms. Finn in 2017 and 2018 fall within the respective appropriate *McCulloch* ranges; therefore, I find the requested rates reasonable.

Petitioner has requested hourly rates for Ms. Finn's paralegal, Jessica Wallace, of $135.00 for work performed in 2015 and 2016, and $145.00 for work performed in 2017. Petitioner has requested hourly rates for Ms. Finn's nurse consultant, Jill Rubolino, of $125.00 for work performed in 2016 and $145.00 for work performed in 2017. Both Ms. Wallace and Ms. Rubolino have previously been awarded the requested rates. *Mulroy v. Sec'y of Health & Human Servs.*, No. 15-1324V, 2017 WL 4585570 at *3 (Fed. Cl. Spec. Mstr. Sept. 19, 2017).

Ms. Finn also billed three hours of work in 2015 at an hourly rate of $400.00. Motion for Fees, Ex. 1 at 2. This appears to be an error. Ms. Finn's hourly rate for those three hours will be reduced from $400.00 to $316.00, the rate that she has billed for other work performed in 2015. Similarly, it appears that Ms. Wallace billed 0.10 hours of work in 2017 at an hourly rate of $148.00. Ms. Wallace's hourly rate for that time will be reduced to $145.00, the rate that she billed for other work performed in 2017. Accordingly, attorneys' fees are reduced by $252.30, from $13,355.30 to $13,103.00.

2.      **Hours Reasonably Expended**

Attorneys' fees are awarded for the "number of hours reasonably expended on the litigation." *Avera*, 515 F.3d at 1348. Counsel should not include in their fee requests hours that are "excessive, redundant, or otherwise unnecessary." *Saxton ex rel. Saxton v. Sec'y of Health & Human Servs.*, 3 F.3d 1517, 1521 (Fed. Cir. 1993) (quoting *Hensley v. Eckerhart*, 461 U.S. 424, 434 (1983)). "Unreasonably duplicative or excessive billing" includes "an attorney billing for a single task on multiple occasions, multiple attorneys billing for a single task, attorneys billing excessively for intra office communications, attorneys billing excessive hours, [and] attorneys entering erroneous billing entries." *Raymo v. Sec'y of Health & Human Servs.*, 129 Fed. Cl. 691, 703 (2016). While attorneys may be compensated for non-attorney-level work, the rate must be comparable to what would be paid for a paralegal or secretary. *O'Neill v. Sec'y of Health & Human*

Forum-Rate-Fee-Schedule2015-2016.pdf (last visited July 20, 2018); Office of Special Masters, *Attorneys' Forum Hourly Rate Fee Schedule: 2017*,
http://www.uscfc.uscourts.gov/sites/default/files/Attorneys-Forum-Rate-Fee-Schedule2017.pdf (last visited July 20, 2018); Office of Special Masters, Attorneys' Forum Hourly Rate Fee Schedule: 2018, http://www.uscfc.uscourts.gov/sites/default/files-Attorneys-Forum-Rate-Fee-Schedule2018.pdf (last visited July 20, 2018).

*Servs.*, No. 08-243V, 2015 WL 2399211, at *9 (Fed. Cl. Spec. Mstr. Apr. 28, 2015). Clerical and secretarial tasks should not be billed at all, regardless of who performs them. *McCulloch*, 2015 WL 5634323, at *26. Hours spent traveling are ordinarily compensated at one-half of the normal hourly attorney rate. *Scott v. Sec'y of Health & Human Servs.*, No. 08-756V, 2014 WL 2885684, at *3 (Fed. Cl. Spec. Mstr. June 5, 2014) (collecting cases). And "it is inappropriate for counsel to bill time for educating themselves about basic aspects of the Vaccine Program." *Matthews v. Sec'y of Health & Human Servs.*, No 14-1111V, 2016 WL 2853910, at *2 (Fed. Cl. Spec. Mstr. Apr. 18, 2016). Ultimately, it is "well within the Special Master's discretion to reduce the hours to a number that, in [her] experience and judgment, [is] reasonable for the work done." *Saxton*, 3 F.3d at 1522. In exercising that discretion, special masters may reduce the number of hours submitted by a percentage of the amount charged. *See Broekelschen*, 102 Fed. Cl. at 728-29 (affirming the Special Master's reduction of attorney and paralegal hours); *Guy v. Sec'y of Health & Human Servs.*, 38 Fed. Cl. 403, 406 (1997) (same).

Upon review of petitioner's application, the undersigned finds that the number of hours billed were reasonable.

### 3.      Reasonable Costs

Petitioner requested a total of $11,750.92[4] in attorneys' costs. Motion for Fees, ECF No. 49. The requested costs consist of $11,250.00 in expert fees to Dr. Laurel Waters, $100.92 in costs associated with obtaining medical records, and the $400.00 filing fee. *Id*. The undersigned finds petitioner's requested costs to be reasonable.

### III. Total Award Summary

Based on the foregoing, the undersigned **awards the total of $24,853.92**,[5] representing reimbursement for attorneys' fees in the amount of $13,103.00 and costs in the amount of $11,750.92, in the form of a check made payable jointly to petitioner and petitioner's counsel, Patricia Finn, Esq. The Clerk of the Court is directed to enter judgment in accordance with this Decision.[6]

---

[4] Petitioner's Motion for Attorneys' Fees and Costs requests $11,250.00 in expert fees and $100.92 in costs. However, the $400.00 filing fee appears to have been left out of petitioner's total request for fees and costs. The filing fee is listed as an expense on petitioner's billing records. It appears that there was an error in petitioner's billing software, which resulted in the cost of the filing fee being excluded from the total amount of fees and costs. We have included the amount of the filing fee in the award.

[5] This amount is intended to cover all legal expenses incurred in this matter. This award encompasses all charges by the attorney against a client, "advanced costs" as well as fees for legal services rendered. Furthermore, § 15(e)(3) prevents an attorney from charging or collecting fees (including costs) that would be in addition to the amount awarded herein. *See generally Beck v. Sec'y of Health & Human Servs.*, 924 F.2d 1029 (Fed. Cir. 1991).

[6] Pursuant to Vaccine Rule 11(a), entry of judgment can be expedited by each party filing a notice renouncing the right to seek review.

**IT IS SO ORDERED.**

<u>**s/ Mindy Michaels Roth**</u>
Mindy Michaels Roth
Special Master